**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| CELEBRITY ATTRACTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO.  CIV-15-1267-HE |
| | ) | |
| OKLAHOMA CITY PUBLIC PROPERTY | ) | |
| AUTHORITY, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

In this case, plaintiff Celebrity Attractions, Inc. ("Celebrity") asserts claims against

the Oklahoma City Public Property Authority ("the Authority") and the Civic Center

Foundation ("the Foundation") arising out of a dispute over use of the Thelma Gaylord

Theatre, located in Oklahoma City's Civic Center Music Hall ("CCMH"), to present a

Broadway show season.[1]  Celebrity is the entity which has produced Oklahoma City's

Broadway show season, normally at the CCMH, for the past 24 years.  The Authority is a

public trust which operates the CCMH pursuant to a long term lease from the City of

Oklahoma City.  The Foundation is a non-profit corporation which was formed in 2001 to

engage in fundraising and other activities supporting the renovation and operation of the

CCMH.  During 2015, the Authority took various steps which resulted in Celebrity not being

selected to produce the 2016–17 season and in the present dispute.

Celebrity asserts multiple claims against defendants.  It asserts against both

---

[1]*The Thelma Gaylord Theatre is the main performance hall of the CCMH.  References to the
"CCMH" in this order are to either the performance hall or the larger facility, as the context
requires.*

defendants, pursuant to 42 U.S.C. § 1983, a claim for violation of its First Amendment and Equal Protection rights. It asserts claims for breach of contract and for breach of the implied duty of good faith and fair dealing against the Authority. It asserts claims for misappropriation of trade secrets and tortious interference with prospective economic advantage against the Foundation. The complaint seeks both compensatory and other damages, and injunctive relief. The injunctive relief sought is for an order compelling the Authority to issue to Celebrity a permit for use of the CCMH for various dates comprising its planned 2016–17 Broadway show season and prohibiting the Foundation from accessing or using what Celebrity views as its customer information.

Celebrity has moved for entry of a preliminary injunction consistent with the injunctive relief sought in the complaint. The court held a hearing on the motion on December 17, 2015, at which all parties appeared, evidence was taken, and argument from counsel heard.

Factual findings and background

For the most part, the facts underlying the present controversy are undisputed. Celebrity is an Oklahoma corporation based in Tulsa. It is in the business of producing Broadway-style shows and does so in several cities in this region of the United States. For the past 24 years, Celebrity has produced an annual Broadway "season," a series of Broadway shows, in Oklahoma City at the CCMH.[2] Although there was no explicit written

---

[2]*At certain times, the shows were conducted at other locations while the CCMH was undergoing renovation.*

2

agreement giving Celebrity the exclusive right to present such shows at the CCMH, it was the *de facto* exclusive presenter of Broadway shows during that period.[3]  Celebrity was considered one of the "resident artists" at the CCMH, along with the Canterbury Chorale Society, the Lyric Theater, the Oklahoma City Ballet, and the Oklahoma City Philharmonic, each of which regularly present performances at the CCMH.  Celebrity is a for-profit company.  All other resident artists at the CCMH are non-profit entities.

The right to present performances at the CCMH, and the timing of them, is controlled by a permit process.  The process leading up to the issuance of a particular permit for a resident artist is informal, but a consistent pattern has emerged over the years.  Each year, Authority officials use the resident artists' historical use patterns to allocate tentative reserved dates for the fifth calendar year out.  These dates are viewed as "penciled in" on the master calendar and, as time passes and the particular out-year gets closer, the resident artists are viewed as having an increasingly firm claim on the dates so assigned to them.  The resident artists routinely negotiate among themselves to swap or adjust dates as necessary to accommodate the particular needs and plans of each entity as the year of performance gets closer.  Finally, in January of the year of performance, the Authority issues a formal permit for use of the facility (the "use permit"), to which the permittee agrees.  The use permit sets out the dates when the permittee is authorized to use the CCMH, states the rent to be charged

---

[3]*The evidence established that, on occasion, entities other than Celebrity had produced particular shows or events, but only Celebrity has produced in that time frame the series of performances comprising each "Broadway show season."*

for the various dates, and includes a variety of other terms and conditions. During the same general time period, the Authority and the permittee enter into an agreement called the "T.H.E. Box Office Permit" (the "box office agreement") which addresses ticketing and related services.

The use permit issued to Celebrity in January of 2015 included a provision in which the parties agreed to "review previously held dates and endeavor to negotiate and execute a successor permit" for the next year's season. Doc. No. 1-1 at 5.[4] This provision is the principal basis for Celebrity's breach of contract claim.

The most recent box office agreement between Celebrity and the Authority (like previous agreements) gives the Civic Center box office the sole and exclusive right to sell and distribute admission tickets to each event. However, Celebrity retains a right to sell tickets on its own and is designated as the primary box office for season ticket renewals. All ticketing information, including season subscriber information, is entered into the box office system. The box office agreement includes a provision that "[a]ll account information collected for storage and use on [the box office] ticketing system, is considered the intellectual property of T.H.E. Box Office and the Oklahoma City Public Property Authority." Doc. No. 20-6 at 8. It also includes language designating Celebrity as the "Primary Box Office for season ticket renewals" which plaintiff argues recognizes its ownership interest in the subscriber information.

---

[4]*Page references are based on the pagination employed by the court's electronic filing system.*

During the 2013–14 time period, the City of Oklahoma City and the Foundation began a planning process directed to optimizing the use of the CCMH, identifying necessary improvements to the facility, and figuring out a way to pay for them. They contracted for a utilization study, which concluded that over $38,000,000 of improvements, phased in over time, were needed or desirable. They also explored various approaches to raising the necessary funds. The eventual result was a determination that, as to the production of Broadway shows, the Foundation should act as a co-promoter of these shows. This arrangement was reflected in a revised agreement between the Authority and the Foundation (the "Foundation Agreement") executed May 18, 2015 [Doc. No. 20-1].[5]

Under the Foundation Agreement, the Foundation was designated as a co-promoter of the Broadway show season, was to select the other co-promoter, had a right of first refusal as to single night or non-series performances (i.e. those not part of the "season") and was obligated to use the net proceeds from performances it promoted at the CCMH for the purpose of funding improvements to the facility or its own operations. Under the agreement, the Foundation had these co-promotion rights for a 25-year term.[6] The Foundation Agreement also provided that there would be a single Broadway show season; it contemplated that the arrangement with the Foundation would be the exclusive vehicle for

---

[5]*The Foundation Agreement addresses a wide variety of fundraising, maintenance and other issues. Only those aspects of the agreement most applicable to the production of Broadway shows are referenced here.*

[6]*The 25-year term is less significant than might first appear, as, with certain limitations, the Foundation Agreement is terminable by either party, without cause, upon 120 days written notice to the other party. [Doc. No. 20-1, ¶ 8(b)].*

presenting a Broadway show season at the CCMH.

The Foundation then began a "Request for Qualification" process to identify and select the co-promoter they would use for the 2016–17 season. It formed a "Broadway Co-Promotion Selection Committee" composed of certain Foundation board members, the manager of the CCMH, community representatives, and a representative of the resident artists. It engaged a consultant to assist in formulating the request for qualification process and to solicit submissions from potential co-promoters.

The selection committee required submission of written information from each applicant and employed a two-tiered system of extensive interviews with the applicants.

Four different entities, including Celebrity, submitted applications seeking to be selected as the co-promoter. The first series of interviews narrowed the applicants to two finalists. Celebrity was not one of the finalists. After further interviews, Nederlander Producing Company of America Inc. was selected as the co-promoter.

Despite that selection, Celebrity pursued with the Authority a use permit for the 2016–17 season, based on the dates that had been identified for it in prior years. The Authority denied the request, referencing the selection process, and indicated that the various dates had been released to the Foundation.

In September 2015, the Authority sent an email to past patrons of the Broadway show series on behalf of the Foundation, indicating that the Foundation would be selecting a co-promoter under the new arrangement and assuring the patrons that their seating priority would be honored under the new arrangement.

Some time later, this suit followed.

Discussion

The preliminary injunction that plaintiff seeks here is directed to two things. First, it seeks an order directing the Authority to issue it a use permit for the 2016–17 season dates which Celebrity views as belonging to it, and invalidating any provisions of the Foundation Agreement inconsistent with that action. Second, it seeks an order prohibiting the Foundation from using, or causing others to use, subscriber information generated from past shows promoted by Celebrity.

A preliminary injunction is "an extraordinary remedy" and a plaintiff's right to relief must be "clear and unequivocal" to warrant the issuance of one. Schrier v. Univ. of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005). To show the necessary basis for issuance of a preliminary injunction, a movant must establish that (1) irreparable injury will occur if the motion is denied; (2) the movant's threatened injury outweighs the harm that the opposing party would suffer if the injunction is granted; (3) the injunction would not be adverse to the public interest; and (4) there is a substantial likelihood the movant will prevail on the merits. Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009). Where the movant has established that the three "harm" factors tip decidedly in its favor, the "probability of success" requirement is relaxed and the movant need only show "questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation." Heideman v. South Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting cases). In some circumstances, a heightened showing is required. Because

preliminary injunctions are "designed to preserve the relative positions of the parties until a trial on the merits can be held," injunctions that alter the status quo or that seek affirmative or mandatory relief are disfavored. <u>Westar Energy, Inc.</u>, 552 F.3d at 1224. Movants seeking such an injunction must make "a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." <u>O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft</u>, 389 F.3d 973, 975 (10th Cir. 2004).

<u>Use permit for the 2016–17 season.</u>

The injunctive relief directed to issuance of a use permit for the 2016–17 season is mandatory in nature. Thus, Celebrity must make strong showings as to both likelihood of success on the merits and the balance of harms, in addition to meeting its burden to show that the injunction is not adverse to public policy and that the threatened harm to Celebrity would be irreparable.

The court concludes Celebrity is not entitled to a preliminary injunction as to issuance of the use permit because it has not made the necessary showing of irreparable injury, the first element referenced above. The irreparable injury requirement limits injunctive relief to those situations where the remedy at law "cannot adequately compensate the injury sustained" from the threatened conduct or cannot reasonably be measured. <u>Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.</u>, 874 F.2d 1346, 1353–54 (10th Cir. 1989). To support issuance of a preliminary injunction, the threat of irreparable harm cannot be speculative or theoretical; its imminence must present "a clear and present need for equitable relief to prevent irreparable harm." <u>Schrier</u>, 427 F.3d at 1267.

Hence, in the ordinary circumstance, a movant must establish that any harm to it cannot be remedied by an award of money damages. However, where a constitutional violation is alleged, the standard is different. A loss of constitutional rights, particularly those protected by the First Amendment, is presumptively an irreparable injury. Summum v. Pleasant Grove City, 483 F.3d 1044, 1055–56 (10th Cir. 2007), rev'd on other grounds, 555 U.S. 460 (2009).

The most obvious impact of Celebrity's loss of the opportunity to present the 2016–17 season is that it will lose the profits it would otherwise have generated from those performances. However, estimates of lost profits are routinely employed as the basis for an award of monetary damages and there is nothing in plaintiff's submissions to date which persuades the court that those lost profits could not be estimated here. E.g., Dexter 345 Inc. v. Cuomo, 663 F.3d 59, 63 (2nd Cir. 2011) (holding lost profits can be calculated as money damages based on businesses' 54-year and 4-year operating histories). As noted above, plaintiff has a 24-year history of presenting Broadway shows in this market and in this facility. It has ample basis for estimating what its lost profits are likely to be from loss of the 2016–17 performances, sufficient to support an award of monetary damages if that is determined to be appropriate. The fact that such lost profits may be large—and they may well be as to Celebrity—does not mean that they are not subject to determination.

Celebrity argues that the nature of its business is such that its reputation—for following through on its commitments and the like—is of greater importance than might be the case in other contexts. The testimony at the hearing established that the process of contracting for performers and shows is necessarily a flexible one, with verbal commitments

9

often being the basis for future scheduling and changed circumstances often requiring adjustments to those plans. The court does not doubt that reputation is very important in the entertainment production business. However, it is also true that damage to a corporation's business reputation will, at some point, translate into lost bookings, lost business opportunities and the like, and, ultimately, into lost profits. The court is unpersuaded that projecting and determining such lost profits is impossible or inordinately difficult in the present circumstances. As noted above, Celebrity has a track record in multiple markets and a long history against which the impact of particular lost engagements or other such harm can be evaluated.

Moreover, the court cannot say, on the present showing, that damage to Celebrity's reputation is necessarily imminent or certain based on the circumstances present here. Celebrity's chief executive officer testified that if a particular Broadway producer failed to deliver on a promise to bring in a show, he would not deal with them again. That may well be, but that is not necessarily the same situation as where a local promoter is unable to deliver on the arrangements for a particular venue in future years. The evidence indicated that there are various types of arrangements used around the country for presenting Broadway shows or similar productions in public facilities, some like the sort of long term relationship that Celebrity enjoyed with the Authority, some like the public-private partnership that has emerged here between the Authority and the Foundation, as well as others. It seems entirely possible that, viewed from the producer of the show's perspective (i.e. from the Broadway end), they would find somewhat unremarkable the shifts which

10

occur from time to time in a local government's approach to the use of its facilities and not necessarily view that as the fault of the local promoter or as some sort of corporate character defect disqualifying it from future business. In any event, the court concludes plaintiff has not made the necessary showing of imminent and certain harm to its corporate reputation. The result is that plaintiff has not established the existence of "irreparable harm" unless it can show the existence of a constitutional violation such as would trigger the exception noted above.

Celebrity argues there is such a violation here—that the Authority and/or Foundation have violated its constitutional rights under the First Amendment and the Fourteenth Amendment. As noted above, the deprivation of constitutional rights raises a presumption of irreparable injury. However, a movant is not entitled to this presumption if it fails to show a substantial likelihood of success on the merits. Schrier, 427 F.3d at 1266.[7]

In the context of this case, the nature and reach of plaintiff's free speech rights depend on the nature of the facility they seek to use (a forum analysis). At least three categories of forums have been recognized by the Supreme Court: traditional public forums, designated public forums, and limited public forums. Christian Legal Soc. v. Martinez, 561 U.S. 661,

---

[7]The plaintiff-appellant in Schrier was not entitled to the presumption of irreparable injury for his First Amendment claim because the claim did not meet the "requisite" showing of likelihood of success. By "requisite" showing, the Tenth Circuit appears to refer to the standard applicable to the preliminary injunction. In this case, the standard would be that of a "strong showing" necessary for issuance of a mandatory injunction.

678–79, n.11 (2010).[8]  Traditional public forums are relatively easy to identify, but what constitutes a "designated public forum" versus a "limited public forum" is not.  That distinction has been subject to inconsistent treatment in case law and is thus more difficult to identify.  Doe v. City of Albuquerque, 667 F.3d 1111, 1129 (10th Cir. 2012); *e.g.*, Griffin v. Bryant, 30 F.Supp.3d 1139, 1180–81 (D.N.M. 2014) (noting the circuit courts' particular difficulty with the distinction in the context of public comment sessions).  However, they are distinct categories subject to different standards in evaluating the particular government limitations on speech.  Doe, 667 F.3d at 1128.

The nature of the different types of forums is described in Christian Legal Soc. v. Martinez, 561 U.S. at 678–79, n.11.  First, the Court noted the existence of traditional public forums "such as streets and parks."  *Id.*  Second, the Court described designated public forums as created "when government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose."  *Id.* (internal quotation omitted).  Third, the Court defined limited public forums as government property that is "limited to use by certain groups or dedicated solely to the discussion of certain subjects."

Speech restrictions in limited public forums need only be reasonable and viewpoint-neutral.  Shero v. City of Grove, 510 F.3d 1196, 1202 (10th Cir. 2007) (citing Rosenberger

---

[8]*Circuit courts have faced considerable difficulty in applying consistent definitions to these categories, even going so far as to identify a fourth, "designated limited public forum." E.g., Gilles v. Blanchard, 477 F.3d 466, 473–74 (7th Cir. 2007)(discussing the fourth type of public forum); Bowman v. White, 444 F.3d 967, 975 (8th Cir. 2006) ("Despite . . . direction from the Supreme Court, our Circuit's analysis of what constitutes a 'designated public forum,' like our sister Circuits', is far from lucid.").*

v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 829 (1995)).

In determining the nature of a particular forum, a court considers the purpose of the forum, the extent of use of it, and the government's intent in creating a designated public forum. Callaghan, 130 F.3d at 915. Here, the court concludes, on the present showing, that the CCMH (or, more specifically, the Thelma Gaylord Theatre) is a limited public forum rather than a designated public forum. It is not open to all forms of expression in the sense that, for example, a public library is open to the receipt of information by virtually any means. *See* Doe v. City of Albuquerque, 667 F.3d at 1128–30. Rather, the performance hall, at least in recent years, has been substantially devoted to large scale productions involving what plaintiff refers to as the "higher arts"—ballets, symphonies, Broadway shows, and the like. The facility is not open on an indiscriminate basis to anyone, or any entity, which wants to put on a play or music presentation. The city has historically used a permitting process which, by design, focuses on the productions of the resident artists.

Where a limited public forum is involved, particular limitations on speech will not violate the First Amendment if they are reasonable and viewpoint neutral. Christian Legal Soc., 561 U.S. at 679, n. 11. Here, Celebrity urges that the Authority's actions as to Broadway shows are not viewpoint neutral, but the court concludes otherwise. There is no suggestion that the Authority contracted with the Foundation, or that the Foundation selected Nederlander, in an effort to bring in or keep out certain Broadway shows or types of Broadway shows. The evidence at the hearing indicated that defendants were concerned with the timeliness of shows (i.e. whether they came to Oklahoma City relatively quickly after

13

appearing on Broadway, rather than several years later), but that is not the same as "viewpoint."

Celebrity makes an inventive, but unpersuasive, argument that the selection of any "speaker" to the exclusion of others constitutes viewpoint discrimination based on speaker identity, relying on <u>Citizens United v. Fed. Election Comm'n</u>, 558 U.S. 310 (2010). Such an expansive application of the "speaker identity" language in <u>Citizens United</u> would effectively eliminate a public entity's right to limit a facility's use to certain groups or purposes, which is a recognized aspect of the "limited pubic forum" designation**.** <u>Christian Legal Soc.</u>, 561 U.S. at 679, n. 11.[9]  It seems highly unlikely that the Supreme Court had such a result in mind when it decided <u>Citizens United</u>**.**  In any event, the court concludes the restrictions at issue here are viewpoint neutral.

Similarly, the court concludes plaintiff has not shown the particular limitations and restrictions at issue here to be unreasonable.  The decision of the city (i.e. the Authority) to adopt a sort of private-public partnership for operation of the CCMH, or to use a related, non-profit entity as an arm for fundraising and other purposes, is consistent with the approach of many other cities around the country and among the range of reasonable options available to a city for operation of its facilities.  The decision to attempt to fund CCMH operations and improvements by having the Foundation assume a "promoter" role (i.e. becoming an equity player in the enterprise, with participation in the financial upside of the venture, rather than

---

[9]*See also,* <u>Christian Legal Soc.,</u> *561 U.S. at 681 ( " 'Implicit in the concept' of a limited public forum is the State's 'right to make distinctions in access on the basis of … speaker identity.' ").*

14

just charging flat fees) is within the zone of reasonable options.

The evidence established that it is the universal, or near universal, practice around the country for cities of Oklahoma City's size to insist (in particular public facilities) on a single Broadway show season, on the basis that the particular market will not support multiple seasons of top-tier quality or that, as to a particular facility, better program balance ("varietal balance") results. Defendants' evidence is that they took those considerations into account in reaching the conclusion that an exclusive promotion arrangement made sense for Oklahoma City. As a result, the "exclusivity" feature to which Celebrity now objects has a reasonable basis.[10]

Finally, to the extent Celebrity challenges the selection of Nederlander to serve as co-promoter for the 2016–17 season, the evidence established that decision to be within the "zone of reasonableness" as well. The evidence established that the Foundation used a thoughtful and deliberate "request for qualification" process, relied on the advice of industry experts in designing it, and conducted a meaningful selection exercise. There are no doubt many aspects of Celebrity's history and conduct in Oklahoma City that are positive and which would have supported a decision by the Foundation to select Celebrity if they had done so. But that does not make Nederlander's selection unreasonable. The factors identified by the Foundation representatives testifying—Nederlander's market share and its

---

[10]*The fact that Celebrity itself had an essentially exclusive arrangement over the past 24 years, substantially contributing to its financial success, is some evidence of the nature of the market.*

ability to arrange newer shows, the breadth of its contacts in the industry, and the like—provide a reasonable basis for the decision made by the Foundation.

In any event, the court concludes plaintiff has not shown the existence of a First Amendment violation such as would trigger the exception to the "irreparable injury" standard for constitutional rights.[11]

The result is the same insofar as plaintiff asserts a violation of the Fourteenth Amendment. At the hearing, Celebrity clarified that its Fourteenth Amendment claim is one based on the Equal Protection clause. Absent situations involving some fundamental right,[12] the question is ordinarily whether a particular governmental classification has a rational basis. KT&G Corp. v. Attorney Gen. of the State of Okla., 535 F.3d 1114, 1137 (10th Cir. 2008). Here, the "classifications" upon which plaintiff apparently relies for its argument—whether the city may prefer a related or non-profit "partner" rather than a private commercial entity, or whether the city may treat commercial entities differently from non-profits, or whether the city may promote Broadway shows through an exclusive arrangement—survive rational basis scrutiny largely for the same reasons as are discussed

---

[11]*The question of what type of forum analysis applies depends on standards which are not much clearer than those governing which monuments can or cannot be located on public property. However, even if the CCMH was ultimately determined to be a "designated public forum," the content-neutral nature of the limitations involved, coupled with the public interest in providing high quality "higher arts" entertainment, might well be sufficient to justify the restrictions at issue here. However, in light of the court's conclusion that the CCMH is a limited public forum, it is unnecessary to belabor the question now.*

[12]*First Amendment rights are, of course, fundamental, but no First Amendment violation has been made out here for the reasons indicated.*

above as to the reasonableness of the various arrangements. *See generally,* <u>KT&G Corp.</u>, 535 F.3d 1114 (10th Cir. 2008).

Celebrity has not shown a likelihood of success as to the claimed constitutional violations. If it is able to establish a breach of its contract or related rights—and it may be able to do so—the injury flowing from that breach is compensable by money damages. The "irreparable injury" requirement necessary to the issuance of a preliminary injunction is therefore not met as to the relief related to the 2016–17 season. The issuance of a preliminary injunction directed to the issuance of a use permit is not warranted.

<u>Trade secrets—subscriber lists</u>

Unlike an injunction directing the issuance of a permit, an injunction barring use of the subscriber information claimed by Celebrity would be prohibitive or restraining in nature, and thus not subject to the higher standard applicable to mandatory injunctions. Instead, a movant need only make the basic four-element showing unless the somewhat relaxed "fair ground for litigation" standard applies. That standard is applicable if Celebrity can establish that the other three factors (irreparable harm, balance of harms, and public policy) tip decidedly in its favor. If so, Celebrity must then show, as to probability of success, only "that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." <u>David v. Mineta</u>, 302 F.3d 1104, 1111 (10th Cir. 2002).

Celebrity alleges the Foundation violated Oklahoma's Uniform Trade Secrets Act, 78 O.S. § 85 *et seq.*, by causing the Authority to send e-mails on the Foundation's behalf to the

subscriber list developed by Celebrity and which the Authority was under a duty to keep confidential for Celebrity's benefit. It objects to any further effort by the Authority or Foundation to promote a Broadway show season by using the list for any entity other than plaintiff. The Foundation's principal defense is that, under the terms of the box office permit that Celebrity obtains for each season, the Authority is the owner of all account information stored in the ticketing system. Thus, the Authority (and by extension the Foundation) cannot misappropriate information that already belongs to it. In response, Celebrity points to language in the same permit that assigns Celebrity the role of "Primary Box Office" for season ticket renewals and retains for Celebrity the full authority to sell season, group, and individual tickets.

The court concludes, in light of explicit language included in the box office agreements, that Celebrity is unlikely to succeed on the merits of its trade secret claim and the basis for that conclusion is addressed below. However, as a strong showing on the other three elements could potentially permit application of a more relaxed showing as to likelihood of success, the other elements are referenced briefly. Plaintiff's evidence was sufficient to make the necessary showing as to two, but not all three, of the other elements.

As to the first element, the court concludes plaintiff has shown the necessary "irreparable injury" as to the subscriber lists. The injury flowing from misappropriation of trade secrets is presumptively irreparable. The presumption applies when the conduct sought to be enjoined is prohibited by a statute which explicitly empowers the district court to grant injunctive relief. Atchison, Topeka, and Santa Fe Ry. Co. v. Lennen, 640 F.2d 255, 259–60

(10th Cir. 1981). An Oklahoma statute, 78 O.S. § 87, provides that "[a]ctual or threatened misappropriation may be enjoined." Failure to show likelihood of success on the merits, however, may undercut the applicability of this presumption. The Tenth Circuit's articulation of the rule opens with the phrase: "[w]hen the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute . . . ." Atchison, Topeka, and Santa Fe Ry. Co., 640 F.2d at 259. Thus, much like the presumption of irreparable harm with respect to constitutional claims, this presumption may not apply at all unless there is a sufficient showing that a prohibited practice is occurring or about to occur, i.e. that plaintiff is likely to succeed on the merits. For present purposes, however, the court assumes Celebrity's claimed injuries based on the subscriber lists qualify as irreparable based on the statute.

As to the third element—whether issuance of the injunction would be contrary to the public interest—the court concludes plaintiff has made a sufficient showing. It would not be contrary to the public interest to issue an injunction if plaintiff otherwise establishes its ownership of, or exclusive entitlement to, the information. The underlying dispute is over who owns the customer data and who gets to use it to pursue their commercial objectives. There is a substantial public interest in protecting the property and related rights of any person or entity. If Celebrity in fact owns the data or otherwise has the exclusive right to use it, there is no apparent interest of the public which would outweigh those private property rights or the reasonable contractual expectations of the parties.

However, as to the remaining element—balancing the relative harms to the

parties—the court concludes plaintiff has not made the necessary strong showing to tip the scales in its favor.

Celebrity's representative testified that its base of subscriber information is a large part of what has made its operations in Oklahoma City a financial success, and that is no doubt true. The identification of an existing customer base obviously provides a substantial advantage in marketing efforts for futures shows or seasons. However, the same can be said of the Foundation or its co-promoter. The Foundation's ability to successfully market the 2016–17 season will also be substantially affected by whether it has access to, or may properly use, that subscriber information. The harms that Celebrity indicates would flow to it from use of the information by a competitor—its lost profits and the damage to its reputation as the promoter for the Oklahoma City market— is essentially the same harm as would result to the Foundation and, indirectly, the Authority, from losing access to the information.[13] Whichever entity has the right to the use of the information will be harmed financially if it is used by others, but the question of which entity has that right is the central question at issue here. On the present showing, Celebrity has not made the necessary strong showing that the harm to it will be significantly greater than the harm to others if the injunction does not issue. Therefore, the more forgiving standard sometimes applicable in determining the likelihood of success on the merits does not apply here.

---

[13]*Of course, the central cause of the financial loss to Celebrity is the loss of the right to present a Broadway season in 2016–17 or, potentially, future years* <u>*at all*</u>*, not just whether it or someone else has a right to use the subscriber lists.*

Tested against the regular standard for assessing the likelihood of success on the merits, the court concludes Celebrity has not made a sufficient showing. The language of the box office permits is relatively straightforward.[14] As noted above, they have stated that all ticket information collected and stored through the T.H.E. Box Office ticketing system is "considered the intellectual property of the T.H.E. Box Office and the Oklahoma City Public Property Authority." The pertinent provision further states, "As such, the Director [the general manager of the Authority or his designee] retains the right to access information , for use in the promotion of upcoming events." Even if the contract's reference to Celebrity as being the "Primary Box Office for season ticket renewals" puts Celebrity in the position of being the "T.H.E. Box Office," that still does not negate the language of the agreement which says the lists are the property of the box office "<u>and</u> the Oklahoma City Public Property Authority." (Emphasis added). Further, there is nothing obviously inconsistent with treating the Authority as an owner of the information while reserving the right to serve as the "primary" box office, with whatever impact that may have on fees or other aspects of the financial relationship, and ownership of the subscriber data. It may well be that, upon fuller development of the historical background and practice or of the discussions which went into the arguably ambiguous provisions of paragraph 10 in the box office agreement, plaintiff can establish that it, rather than the Authority, was intended to be the owner of the data. However, the present submissions do not sufficiently support such a conclusion. The court

---

[14]*The same language has been included in the permits for several years, apparently including most or all of the years during which the subscriber data was generated.*

therefore concludes Celebrity has not made the necessary showing of likelihood of success on the merits.[15]

Conclusion

For these reasons, plaintiff's motion for preliminary injunction [Doc. No. 7] is **DENIED**. As the plaintiff may nonetheless be able to make out a successful claim for breach of contract based on the language of the use permit and the parties' course of dealings, and as the potential financial consequences to both sides are substantial in any event, the court urges the parties to explore fully the prospects for an agreed resolution of this case at an early opportunity.

**IT IS SO ORDERED**.

Dated this 11th day of January, 2016.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE

---

[15]*The parties have referred to an Interlocal Agreement between the Authority and the City of Tulsa relating to ticketing services, and a 2015 amended version of it [Doc. Nos. 20-5 and 20-7]. The court does not view that agreement as having much, if any, impact in this case. It does suggest that the parties to the agreement viewed the ticketing information as confidential, but does not address the question of who, as between the Authority and Celebrity, owns it. As Celebrity notes [Doc. No. 23 at 8–9], it was not a party to that agreement and is not bound by whatever the Authority and Tulsa may have agreed to between themselves. And even if that were not the case, there is no apparent basis on which the Authority could apply to otherwise confidential, pre-existing information an "ownership" status based on retroactive application of the September 2015 amended agreement. The agreement is ineffective to either create ownership of the subscriber information in Celebrity or to cut off any interest it might otherwise have had.*

22